# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

————

No. 04-2505

————

United States of America,        *
                            *

       Plaintiff - Appellee,    *

                            *   Appeal from the United States
     v.                       *   District Court for the
                            *   Western District of Arkansas.
Tracy Smith,                *
also known as Trashawn Johnson,  *

                            *
       Defendant - Appellant.  *

————

Submitted: January 11, 2005
Filed: June 3, 2005

————

Before LOKEN, Chief Judge, MORRIS SHEPPARD ARNOLD and MURPHY, Circuit Judges.

————

MURPHY, Circuit Judge.

A jury convicted Tracy Smith of conspiracy to distribute more than fifty grams of cocaine base and conspiracy to commit money laundering, and he was sentenced to 292 months. Smith appeals, arguing that the district court[1] should not have allowed the case agent to answer a question to which he objected and that his sentence violated his constitutional rights. We affirm.

———————————

[1]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

I.

Troy Mendenhall was the head of an organization distributing crack cocaine in Malvern, Arkansas. Both his brother James Mendenhall and his nephew Keishawn Reed were involved in selling the drugs. The organization obtained powder cocaine from Tracy Smith in California, converted it to crack, and then sold it in Arkansas. The organization used at least six couriers to transport the drugs and to take money to California in payment. They generally traveled by commercial airlines or Greyhound bus. One of the couriers told investigators she made one or two trips to California each month and returned with one to two kilograms of cocaine each time. She reported that she made the trips at the direction of Troy Mendenhall or Tracy Smith and was paid $1,000 to $2,000 per trip.

On several occasions couriers for the Mendenhall organization were intercepted while carrying drugs or large amounts of cash to pay Smith for cocaine. Keishawn Reed and another man were stopped in the St. Louis airport with $29,020 concealed in their shoes. Officers encountered Smith's sister at the Little Rock airport with $9,322 which she indicated belonged to Troy Mendenhall, and another courier stopped there had $9,700 in cashier checks purchased by Troy Mendenhall. One courier linked to the Mendenhalls was found at the Greyhound bus station in Texarkana with 695.3 grams of powder cocaine.

The organization began sending purchase money to Smith in California by Western Union in approximately 1998. Records from Western Union show that no fewer than 132 transfers totaling $70,420 were made by Reed and Troy Mendenhall, payable to individuals in Arkansas, Louisiana, Texas, Illinois, and California. At least 28 money orders totaling $45,250 were sent to or by Smith to facilitate the distribution of cocaine base. Reed also bought two vehicles for Smith as payment for cocaine and registered the vehicles in his own name to conceal their true ownership.

According to Reed, the Mendenhall organization sold more than 4 kilograms of crack each month between 1997 and 1999.

Smith, Troy and James Mendenhall, and Reed were charged in a second superseding indictment with conspiring to distribute more than 50 grams of a mixture or substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (count 1), and conspiring to conduct financial transactions affecting interstate commerce involving proceeds from the distribution of cocaine base, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), and (h) (count 2). Troy Mendenhall was charged with one other count and James Mendenhall with five additional counts. The indictment alleged that as part of the conspiracy Smith sold cocaine base to Troy Mendenhall and received drug proceeds and two vehicles in return. The Mendenhalls and Reed pled guilty, but Smith went to trial. He was convicted by the jury on both counts and sentenced to 292 months.

II.

During its case in chief the prosecution called Rochelle Boswell Washington to testify. Washington is the mother of Smith's child and a niece of Troy Mendenhall. Although she proved to be a somewhat reluctant witness, she testified that she had delivered money from Mendenhall to Smith in California and had also wired it by Western Union. At first she denied that Smith had asked her to wire him money from Mendenhall, but on further questioning she admitted that she had testified to that before the grand jury. She testified that she, along with Smith and another man, had been stopped by police on one of her trips to California. When the police inquired about the large amount of cash she had, she answered that she had come to California to buy merchandise for a fashion business. She first denied she had been told to use a cover story if stopped while carrying drug money, then subsequently admitted she had told the grand jury that Mendenhall had given her that instruction.

When Washington was asked if she had ever seen anyone deliver cocaine to Smith, she answered that she had once seen a woman deliver a bag to Smith but she had not seen the contents. She testified about an incident in which Smith asked her to follow him to a house and they exchanged vehicles after he stopped inside; she then drove his car to his sister's apartment where the sister took a package from under the driver seat. The prosecutor also asked Washington if she remembered hearing a conversation between Troy Mendenhall and Smith about drug prices. After refreshing her memory with the transcript of her grand jury testimony, Washington testified that she had heard Mendenhall tell Smith how much he paid for cocaine and that he sold crack to generate the most profit. On cross examination defense counsel asked her whether she had ever seen Smith with a powdery white substance or seen him sell cocaine or crack. She said that she had not. In answer to other questions by defense counsel, she denied ever seeing any cocaine during the time she lived in California or seeing Smith with an exorbitant amount of money or doing anything for which he deserved jail time.

Special Agent Harness, who had investigated the case and had interviewed Washington before she testified to the grand jury, was also called as a prosecution witness at trial. After Harness gave his testimony on direct, defense counsel asked him about his grand jury testimony in which he had repeated statements made by Washington in her interview. Defense counsel asked Harness if he had told the grand jury that Washington had heard Troy Mendenhall tell Smith what he usually paid for cocaine. Harness answered that he had and that Washington had told him Mendenhall was talking about his profit margin. Defense counsel asked why Mendenhall would tell Smith about the price he paid for cocaine if Smith were his supplier of cocaine. Harness answered that this reference was only part of what Washington had told him.

On redirect the prosecutor attempted to put Washington's statement in context and asked the question at issue on Smith's appeal: whether Washington had made it

clear throughout her interview and grand jury testimony that Smith supplied cocaine to Mendenhall. Defense counsel's objection to this question was that Washington had already given her testimony. The district court overruled the objection on the basis that the evidence counsel had elicited on cross examination of Harness could be misleading if not put in context. Harness then answered yes to the question.

Although the objection made at trial was that Washington had already testified and that defense counsel had only asked Harness about his own grand jury testimony, Smith now raises a new objection to the evidence. He argues that the question to Harness called for a hearsay answer which should not have been admitted. The government responds that the evidence was not hearsay and that it was admissible under Federal Rule of Evidence 801(d)(1)(A) because Washington's grand jury testimony was inconsistent with what she said at trial. It also contends that it was proper redirect because defense counsel had asked Harness about Washington's statement and created a false impression about it. Moreover it says, admission of the evidence was at most harmless error because of overwhelming evidence of Smith's guilt.

After examining the record, we conclude that the district court did not abuse its discretion in overruling Smith's objection at trial. The challenged evidence was relevant, and the objection raised at trial lacked merit. Defense counsel opened up the subject of Washington's interview with Harness by his earlier questioning, creating an incomplete and misleading impression of her statement and grand jury testimony. See United States v. Womochil, 778 F.2d 1311, 1315 (8th Cir. 1985). An objection on the basis that the question was leading might have been sustained, but that objection was not made.

No hearsay objection was made at trial, see Fed. R. Evid. 103(a)(1) (objection must state specific ground if not apparent), and Smith has not shown plain error. See Fed. R. Evid. 103(d). Harness did not repeat any statements Washington made nor

vouch for their truth. Since Washington testified at trial and was subject to cross examination, any inconsistent grand jury testimony would not be hearsay, see Fed. R. Evid. 801(d)(1)(A), but it is not clear from the record before us whether or not the testimony was actually inconsistent.

If there were any error in allowing the challenged evidence, it would be harmless since there was so much evidence of Smith's guilt.[2] See United States v. White, 11 F.3d 1446, 1451 (8th Cir. 1993) (harmless error if other evidence to the same effect is properly before the jury). Washington was only one of the witnesses who gave evidence implicating Smith. Keishawn Reed, a coconspirator, testified that Smith was a supplier of cocaine and had traveled from California to Arkansas to help sell crack cocaine. Reed told the jury that he and others had been stopped in airports in St. Louis and Little Rock while carrying large amounts of cash to be used to purchase cocaine from Smith in California. They sent money to Smith by Western Union and used drug money to purchase cashier checks to pay Smith for cocaine. Money from the sale of crack cocaine had also been used to buy two vehicles in Smith's name. Reed's testimony was corroborated by records from Western Union, bank records showing the purchase of cashier checks, and records about the purchase of the two vehicles. Other witnesses added their testimony about delivering money and cocaine for Smith, and Agent Harness testified about admissions Smith had made to him. Smith had admitted, for example, that he regularly sold cocaine to people in Arkansas from his base in California and that he received payment from Arkansas by couriers or Western Union.

---

[2]Although Smith did not argue in the district court or on appeal that the challenged evidence violated his right to confrontation, any error in its admission would be harmless beyond a reasonable doubt given the strength of the evidence against him. See United States v. Copley, 938 F.2d 107, 110 (8th Cir. 1991).

III.

In Smith's pro se supplemental brief he argues that his sentence violated his right to a jury trial and his right to due process, citing Blakely v. Washington, 124 S. Ct. 2531 (2004).[3] Smith contends that his sentence was based on a court finding that he was responsible for 96 kilograms of cocaine base, rather than on the jury finding of more than 50 grams. He says this was plain error.

The Presentence Investigation Report (PSR) calculated that Smith's relevant conduct under U.S.S.G. § 1B1.3 involved more than 96 kilograms of crack cocaine and set Smith's base offense level at 38. That is the base offense level the guidelines manual provides for 1.5 kilograms or more of cocaine base. The PSR also recommended a three level enhancement for managerial or supervisory role under U.S.S.G. § 3B1.1(b) and reported Smith's criminal history at category VI. With a total offense level of 41 and criminal history category of VI, Smith's guideline sentencing range would have been 360 months to life.

Although Smith did not file a written objection to the PSR calculation of drug quantity, the district court asked his counsel at sentencing if Smith should be held responsible for less than 1.5 kilograms. Counsel responded that only one witness had testified about receiving a package of cocaine from Smith and that it contained less than that amount. The district court found, however, that there was "overwhelming" evidence that more than 1.5 kilograms of crack were attributable to Smith. It set his base offense level at 38 and declined to impose a role enhancement under § 3B1.1(b).

---

[3]Although Smith has protected his appellate record by raising a Blakely issue on direct appeal, he asserts his counsel was ineffective for not having done it and supports counsel's motion to withdraw. Claims of ineffective assistance should almost always be resolved in collateral proceedings, rather than on direct appeal, so that a fuller record can be made on the issues. See United States v. Lee, 374 F.3d 637, 654 (8th Cir. 2004).

It also found Smith entitled to a two level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), resulting in a total offense level of 36. The court then made an adjustment to Smith's criminal history category, finding it had been overstated by two points because of misdemeanors for which he had received probation or a suspended sentence. The court reduced Smith's criminal history category to V which combined with his total offense level of 36 resulted in a sentencing range of 292 to 365 months, instead of the recommended range of 360 months to life. The court then sentenced Smith to 292 months.

Smith did not raise his constitutional issue in the district court, and he concedes that his sentence is therefore reviewed for plain error. See United States v. Olano, 507 U.S. 725, 731-32 (1993). In order to obtain relief under plain error review, there must have been an error that is plain and which affected Smith's substantial rights. United States v. Cotton, 535 U.S. 625, 631 (2002); Olano, 507 U.S. at 732-36. For an error to affect substantial rights it must generally be prejudicial and must have affected the outcome of the district court proceedings. Olano, 507 U.S. at 734-35. Even if there were plain error affecting substantial rights, reversal would only be called for if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Cotton, 535 U.S. at 631 (quotations and internal marks omitted). Plain error review is thus circumscribed. See Jones v. United States, 527 U.S. 373, 389 (1999); United States v. Pirani, No. 03-2871, slip op. at 8 (8th Cir. en banc Apr. 29, 2005).

There was error in this case that was plain because Smith's sentence was imposed under a mandatory guideline system which was held to be unconstitutional in United States v. Booker, 125 S. Ct. 738, 756-57 (2005), see Pirani, slip op. at 8, and Smith's sentence was based on a finding by the court that he was responsible for

more drugs than the jury had found.[4] See Booker, 125 S. Ct. at 755-56. If his base offense level had been calculated on the more than 50 grams of cocaine base found by the jury, it would have been 32 instead of the assigned level of 38 based on the court finding of 1.5 kilograms. Assuming that Smith would have then been classified at criminal history category V without a role enhancement or reduction for acceptance, the resulting guideline range would have been 188-235. The 292 month sentence imposed by the district court was well above that possible range, and under an advisory guideline system other statutory sentencing factors could have affected Smith's final sentence. 18 U.S.C. § 3553(a); Booker, 125 S. Ct. at 764-66.

Smith bears the burden of showing that Booker error prejudiced him and that it affected his substantial rights. Olano, 507 U.S. at 734. A defendant has not met that burden if the effect of an error is uncertain. See Jones, 527 U.S. at 394-95. Here, the district court did express some concern about the applicable sentencing range, observing that it was about double the combined sentences of the codefendants who had pled guilty. The court went on to note, however, that Smith's criminal history category was higher than those of his codefendants. The sentence imposed was justified the court said, due to Smith's involvement in drug dealing over an extended period of time and due to the seriousness of his offense. It explicitly found that the proof was overwhelming that the conspiracy involved more than 1.5 kilograms of cocaine base. After not imposing the recommended role enhancement for manager or supervisor, finding Smith accepted responsibility by making an early and detailed statement to law enforcement and granting him an unusual two level reduction after going to trial, see United States v. Greger, 339 F.3d 666, 673 (8th Cir. 2003), and

---

[4]In Apprendi v. New Jersey, 530 U.S. 466, 489 (2000), the Supreme Court held that based on due process and the Sixth Amendment "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In Booker, the Supreme Court applied the Apprendi rule to the federal sentencing guidelines but also indicated that such error could be remedied by treating the guidelines as merely advisory. 125 S. Ct. at 756-57, 764.

finding his criminal history category overstated by two points despite seven adult criminal convictions, the court appears to have fashioned what it considered to be the appropriate sentence.[5] Near the end of the sentencing hearing, the judge told Smith that he thought "justice will be served by this lengthy sentence."

After examining the record we conclude that Smith has not shown that the sentencing error affected his substantial rights because he has not demonstrated a reasonable probability that the district court would have imposed a more favorable sentence if the guidelines had been treated as advisory rather than mandatory. Pirani, slip op. at 11. The court made findings which adjusted Smith's sentence to a level it found appropriate, and it did not indicate that Smith's sentence was unreasonable, see Pirani, slip op. at 12 n.6. In fact it said his sentence was justified. Since Smith has not shown that there is a reasonable probability that but for the Booker error he would have received a more favorable sentence, he has failed to demonstrate plain error.

Accordingly, we affirm the judgment of the district court and deny defense counsel's pending motion to withdraw.[6]

_____

[5]We note that the government has not challenged the court's application of the guidelines.

[6]Counsel may renew his motion after informing Smith about his option to petition for rehearing and about the procedures for petitioning the Supreme Court for certiorari, in compliance with Part V of our plan to implement the Criminal Justice Act.